IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 4, 2018

## STATE OF TENNESSEE v. GREGORY GILL

**Appeal from the Circuit Court for Madison County**
**No. 16-423    Roy B. Morgan, Jr., Judge**

_____

### No. W2018-00331-CCA-R3-CD

_____

After a jury trial, Gregory Gill, Defendant, was convicted of two counts of possession of cocaine with intent to sell or deliver, two counts of possession of marijuana with intent to sell or deliver, four counts of unlawful possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony, one count of unlawful possession of a firearm after being convicted of a felony involving the attempted use of force, violence, or a deadly weapon, one count of possession of drug paraphernalia, and one count of evading arrest. The trial court sentenced Defendant to a total effective sentence of thirty-eight years in the Tennessee Department of Correction. On appeal, Defendant asserts that: (1) the trial court erred in denying his motion to suppress; (2) the evidence was insufficient for a rational trier of fact to have found him guilty beyond a reasonable doubt; (3) the trial court erred in allowing the State to cross-examine a defense witness about his pending criminal charges; and (4) the trial court imposed an excessive sentence. After a thorough review of the facts and applicable case law, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

George Morton Googe, District Public Defender, and Jeremy B. Epperson, Assistant Public Defender, for the appellant, Gregory Gill.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jody Pickens, District Attorney General; and Lee Sparks, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

On October 3, 2016, the Madison County Grand Jury indicted Defendant on the following charges:

| Count | Charged offense |
|-------|-----------------|
| One | Possession of 0.5 grams or more of cocaine with the intent to sell |
| Two | Possession of 0.5 grams or more of cocaine with the intent to deliver |
| Three | Possession of more than 0.5 ounce of marijuana with the intent to sell |
| Four | Possession of more than 0.5 ounce of marijuana with the intent to deliver |
| Five | Unlawful possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony |
| Six | Unlawful possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony |
| Seven | Unlawful possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony |
| Eight | Unlawful possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony |
| Nine | Unlawful possession of a firearm after being convicted of a felony involving the attempted use of force, violence, or a deadly weapon |
| Ten | Possession of drug paraphernalia |
| Eleven | Evading arrest |

### *Motion to suppress hearing*

Defendant filed a motion to suppress the results of Sergeant Samuel Gilley's warrantless search of his vehicle. He argued that Investigators Scott Cornelison and Kristi Foster "exercised a show of authority in attempting to take Defendant into custody despite having no evidence that . . . Defendant was committing a crime or was about to commit a crime."

Sergeant Gilley testified that he worked for the Jackson Police Department ("JPD") in the narcotics unit. On March 23, 2016, Sergeant Gilley received a description of Defendant from the U.S. Marshals Service and learned that there was an outstanding arrest warrant from Texas for Defendant for third degree felony assault strangulation or suffocation. Sergeant Gilley also received a description of the vehicle that Defendant

was driving. He encountered the vehicle, a blue Chrysler 200 with Colorado tags,[1] at the intersection of Lane Avenue and Highland. Sergeant Gilley, along with Investigators Cornelison and Foster, followed the rental vehicle north on Highland. The rental vehicle eventually turned into the parking lot of the Old Hickory Mall ("the Mall"). The rental vehicle drove by the entrance to the Mall, and a passenger exited the vehicle. Sergeant Gilley observed that the passenger did not match Defendant's description. The rental vehicle then continued into the parking lot and parked. Sergeant Gilley observed Defendant get out of the driver's side of the vehicle, put his hood over his head, and walk towards the entrance to the Mall. Sergeant Gilley pulled his vehicle in front of the Mall to let Investigators Cornelison and Foster, who were wearing plain clothes with a vest marked "police," exit the vehicle. Sergeant Gilley stayed in the vehicle so that he could pursue Defendant if necessary. Defendant turned around, observed Investigators Cornelison and Foster walking towards him, and "took off running through the [M]all." Investigators Cornelison and Foster pursued Defendant through the Mall. Sergeant Gilley drove to the parked rental vehicle. When he exited his vehicle and approached the rental vehicle, he "could smell marijuana coming from the vehicle." Sergeant Gilley shined a light into the rental vehicle and observed "a clear plastic cup laying in the back floorboard" that contained "broken down marijuana[.]" Sergeant Gilley described the smell as "a pungent marijuana odor."[2] Sergeant Gilley asked a patrol unit to unlock the rental vehicle, and Sergeant Gilley then searched it. During the search, Sergeant Gilley found "some packaged marijuana for resale, some packaged crack cocaine, digital scales, [and a] firearm in the passenger compartment of the vehicle." He stated that the packaged marijuana weighed approximately thirty grams and that the packaged cocaine weighed ten or eleven grams. Sergeant Gilley found the firearm, a semi-automatic Glock handgun, under the driver's seat. When Sergeant Gilley searched the rental vehicle's trunk, he found a bag that contained clothing, drug paraphernalia, baggies, and scales. Sergeant Gilley also found Defendant's identification in the trunk.

On cross-examination, Sergeant Gilley agreed that the marijuana in the cup was a residual amount. Sergeant Gilley identified a receipt that was found in the rental vehicle that had "Dreds" written on it. Sergeant Gilley explained that the Glock handgun was under the driver's seat with the handle facing the front of the seat. The handgun had a laser sight attached that was plugged into a USB charger in the cigarette lighter.

---

[1] At trial, Sergeant Gilley testified that a female rented the vehicle from Enterprise.
[2] Sergeant Gilley explained that he identified the odor as marijuana based on his years of work as a law enforcement officer as well as "over 300 hours . . . of specialized training in narcotics identification[.]"

Sergeant Richard Newbill testified that he worked for the JPD in the gang unit. He also worked as an officer on the Gulf Coast Fugitive Task Force.[3] On March 23, 2016, Sergeant Newbill assisted Sergeant Gilley in attempting to apprehend Defendant at the Mall. Sergeant Gilley observed a vehicle that he believed contained Defendant, a known fugitive.[4] Sergeant Newbill learned from Sergeant Gilley that Defendant had left the vehicle and was running away, so Sergeant Newbill headed to the Mall to assist. Sergeant Newbill pursued Defendant to a nearby apartment complex. Sergeant Newbill and other officers located Defendant under a vehicle in the parking lot of the apartment complex. Defendant was taken into custody, and Sergeant Newbill searched Defendant's person incident to that arrest.

On cross-examination, Sergeant Newbill explained that he had a description of the vehicle that Defendant may have been using, and Sergeant Gilley first observed a vehicle that fit the description south of the Mall. On redirect examination, Sergeant Newbill explained that, prior to executing the arrest warrants for Defendant, he viewed a photograph of Defendant. At the time of the arrest, Sergeant Newbill was able to identify Defendant based on the photograph and based on Sergeant Gilley's physical description of Defendant.

Investigator Cornelison testified that he worked in the Jackson-Madison County Metro Narcotics Unit. On March 23, 2016, Investigator Cornelison was working with Investigator Foster and Sergeant Gilley to apprehend Defendant for the purpose of arresting him on active warrants. The law enforcement officers "were following up on some information received on a vehicle and two male subjects possibly selling drugs, not at the [M]all but at another location." The officers "conducted surveillance and followed [the rental] vehicle to the [M]all." Investigator Cornelison observed Defendant exit the vehicle and walk toward the Mall. Investigator Cornelison pulled his vehicle in front of the Mall, exited the vehicle, and attempted to catch up to Defendant. Defendant turned around, observed that Investigator Cornelison was following him, and "took off running." Investigator Cornelison yelled, "Stop. Stop. Police."

The trial court credited the testimony of Sergeant Gilley, Sergeant Newbill, and Investigator Cornelison. The trial court found that the law enforcement officers "had prior knowledge" about Defendant's active warrants from Texas because the U.S.

---

[3] At trial, Sergeant Newbill explained that the Task Force was a "task force through the United States Marshals Service where [law enforcement officers] apprehend fugitives from justice subject to arrest warrants."

[4] Sergeant Newbill explained that the Task Force obtained its own warrants and relied on "collateral" leads from other task forces. The Task Force received a collateral lead from the U.S. Marshals Task Force in Texas about warrants issued for Defendant on the charges of "felony assault, strangulation and suffocation."

Marshals Office distributed a photograph and description of Defendant along with the warrants. The trial court concluded that the search incident to Defendant's arrest was proper and denied the motion to suppress as to the search of Defendant's person. The trial court found that Sergeant Gilley smelled an odor emanating from the rental vehicle that he believed to be marijuana and observed a substance in the rental vehicle that he believed to be marijuana "based on his education, training, and experience[.]" The trial court held that Sergeant Gilley had probable cause to search the rental vehicle based on his observations and smelling of marijuana. The trial court concluded that:

> considering all of this, still the potential of someone else coming back, the mobility of the vehicle, the reduced expectation of privacy, the probable cause having been established from plain view and smell, . . . the motion to suppress should be denied under the circumstances, and any items found in the vehicle certainly could be offered during the course of the trial of the matter.

### *Jury trial*

### The State's proof

At trial, Investigator Cornelison testified similarly to his testimony at the suppression hearing. Additionally, he testified that, after he made contact, Defendant ran from the Mall's front entrance "all the way down to . . . two jewelry stores[.]" Defendant then ran towards the entrance of J.C. Penney's salon, and Investigator Cornelison lost sight of Defendant. When Investigator Cornelison realized that he was not going to be able to apprehend Defendant, he transmitted information on Defendant's location to the other law enforcement officers via radio. Investigator Cornelison was present when Defendant was apprehended at a nearby apartment complex. On cross-examination, Investigator Cornelison stated that he observed at least two people in the rental vehicle when he and the other law enforcement officers first spotted the vehicle.

Sergeant Newbill testified similarly to his testimony at the suppression hearing. He also stated that, after Defendant ran from Investigator Cornelison in the Mall, law enforcement officers began canvassing the area around J.C. Penney and a nearby apartment complex. Officers observed Defendant "running between two cars[,]" but they were unable to apprehend him. Officers expanded their search perimeter and brought in a helicopter and canine officers to assist in the search. Officers finally apprehended Defendant under a vehicle in the parking lot of the apartment complex. Officers arrested Defendant, searched his person, and found keys to a Chrysler vehicle.

Andrea Hays testified that she worked as a detention facility specialist for the Madison County Sheriff's Office. Ms. Hays previously composed a report about an incident that occurred at the Madison County Jail on March 24, 2016. On that date, Defendant informed Ms. Hays that another inmate, Rondarious Bond, stole $1,100 from him. Ms. Hays informed Captain Wilson, who arranged for a corrections officer and the maintenance professional, Tony Campbell, to search the plumbing of a toilet. Mr. Campbell pushed a steel rod into "a clean-out six-inch pipe" behind the toilet and pulled out a potato chip bag. He found $1,070 in cash wrapped in cellophane inside the potato chip bag.

Sergeant Gilley testified similarly to his testimony at the suppression hearing. He also testified that when he searched the trunk of the rental vehicle, he found a blue backpack that contained a jar with Defendant's driver's license, a small plastic bag with a small amount of cocaine, a set of digital scales, and a rolled up dollar bill. Sergeant Gilley found .40-caliber ammunition in both the center console and the blue backpack. He also found a Gander Mountain receipt dated March 17, 2016, for a Crimson Trace laser sight and a second receipt showing that the buyer returned the Crimson Trace laser sight and then purchased a Genesis laser sight and protection plan.

Sergeant Gilley testified that he directed investigators to go to the Madison County Jail and recover money that had been found in a cell. Sergeant Gilley identified a CD that contained the audio recording of the visitation room at the Madison County Jail from March 24, 2016. The audio recording was played for the jury. Sergeant Gilley identified the male voice on the recording as that of Defendant. Approximately forty-five minutes into the recording, Defendant described his interaction with law enforcement during the offenses and mentioned that he "lost [his] phone in the woods" and that "they took . . . almost eleven hundred dollars, some soft, some weed, that damn glock[.]" Defendant described the gun as "a forty" and "the twenty-two glock" with "a beam" and "extendo[.]" Sergeant Gilley explained that "extendo" referred to an extended firearm magazine and that "beam" referred to a laser sight on a firearm. He also explained that "soft" referred to powder cocaine and "weed" referred to marijuana.

Sergeant Gilley testified that individuals frequently used plastic bags and digital scales to measure out and package controlled substances for illegal sale and distribution. He estimated that the marijuana found in the rental vehicle was worth between $500 and $600 and that the cocaine was worth between $1,000 to $3,000. Sergeant Gilley stated that drug dealers frequently carried weapons to discourage individuals from stealing proceeds of drug sales or the controlled substance. Sergeant Gilley testified that, in his opinion, the amount of cocaine that was recovered from the rental vehicle was not consistent with personal use because cocaine users do not carry cocaine around. Instead, cocaine users generally purchase smaller amounts and use the drug rather than carry the

drug with them. Sergeant Gilley testified similarly that the amount of marijuana recovered in the rental vehicle was not consistent with personal use because "most marijuana users that [law enforcement] run into are not going to run around with over a half ounce of marijuana on them because they know a half ounce or more of marijuana is a felony." Sergeant Gilley stated that the fact that Defendant had over $1,000 in his possession in the Madison County Jail indicated that Defendant had recently sold some drugs.

On cross-examination, Sergeant Gilley testified that drug users frequently used a rolled-up dollar bill to snort cocaine, and he agreed that finding a rolled-up bill in the same vicinity of drugs would indicate that the drugs were for personal use. He agreed that Defendant could have learned that law enforcement recovered cocaine, marijuana, and a firearm during the offenses from his arraignment hearing and other legal proceedings that occurred prior to the visitation recording. During redirect examination, Sergeant Gilley stated that drug traffickers use rental vehicles to "move drugs around" because they will not lose ownership of the rental car through forfeiture if arrested on drug charges. He also explained that drug traffickers do not rent vehicles under their name because "obviously they don't want to leave anything that ties back to them[.]"

Brian Simpson testified that he was a manager at Gander Mountain. In March 2016, Mr. Simpson spoke with Sergeant Gilley about a customer's transaction. Mr. Simpson recognized Defendant from a transaction at Gander Mountain; Defendant came into the store around 9:00 p.m. and purchased a laser sight. Defendant left the store but returned approximately twenty minutes later to return the laser sight and purchase a different laser sight. Mr. Simpson recalled that he installed the new laser sight on Defendant's firearm, a Glock. Mr. Simpson identified the two receipts that were found in the rental vehicle as coming from the transactions that Defendant had at Gander Mountain. He noted that the receipts showed that Defendant paid for both laser sights with cash.

Special Agent Peter Hall testified that he worked for the Tennessee Bureau of Investigation ("TBI") as a forensic scientist. Special Agent Hall tested one bag of marijuana that was recovered from the rental vehicle; the substance weighed 17.06 grams. He also testified that the gross weight[5] of the second bag of marijuana was 15.57 grams. Special Agent Hall tested the powder substance that officers recovered from the rental vehicle and confirmed that it was cocaine hydrochloride; the gross weight of this bag of cocaine was 3.42 grams.

---

[5] Special Agent Hall explained that the gross weight of a substance included the bag containing the substance.

The State and Defendant stipulated that Defendant had previously been convicted of a felony that involved the use or attempted use of force, violence, or a deadly weapon.

**Defendant's proof**

Brendan Tyler Burns testified that, on March 23, 2016, he went to get a haircut on Lane Avenue. He explained that he was driving a vehicle that was rented for him by a female friend, "Dannie Ray." After Mr. Burns' haircut, Defendant, who had also gotten a haircut, drove Mr. Burns in the rental vehicle to the Mall. When they arrived at the Mall, Defendant dropped Mr. Burns off at the entrance of the Mall and parked the rental vehicle. As Defendant was walking into the Mall, Mr. Burns observed an officer enter behind Defendant and yell Defendant's name. Defendant "took off running." Mr. Burns said that the officer did not approach him, so he left the Mall, went across the street, and got a ride from his girlfriend because Defendant had the keys to the rental vehicle.

Mr. Burns explained that he owned a backpack found in the front seat of the rental vehicle and "some powder" and "some weed" in the middle console of the passenger compartment. He stated that he also owned several backpacks that were in the trunk of the rental vehicle. He noted that Defendant put a backpack in the trunk when they drove together to the Mall. Mr. Burns thought that Defendant's backpack was green and stated that he owned the black backpack and the blue backpack. He also admitted that he had plastic sandwich baggies in one of his backpacks in the trunk, but he denied that there were any drugs in the trunk. He also denied that he owned the firearm that was found in the rental vehicle; however, he admitted that he gave Defendant some bullets. Mr. Burns explained that he borrowed Defendant's driver's license because he did not have a driver's license and needed identification "to do something[.]" However, he later stated that he used Defendant's driver's license to separate powder cocaine for snorting. He stated that he put Defendant's license in "a little jar [that he] used to have weed in[.]" Additionally, he owned the wrapped-up dollar bill, which he said he used to snort powder cocaine with his friends, and a set of digital scales. Mr. Burns explained that the vehicle rental agreement had "dreads" written on it because he used to wear his hair in dreads, so the female friend that rented the vehicle for him wrote "dreads" instead of his name. He stated that he was not charged with any criminal offenses related to his possession of the items found in the rental vehicle. He asserted that Defendant was unaware that Mr. Burns had drugs and scales in the rental vehicle.

On cross-examination, Mr. Burns admitted that he was a drug dealer. He agreed that he was living in the same jail cell in the Madison County Jail as Defendant from September 2016 through December 2016. Mr. Burns memorialized his version of the events underlying the offenses at issue in writing and sent it in a letter to defense counsel on November 11, 2016. He agreed that he was incarcerated in the same cell in the

- 8 -

Madison County Jail as Defendant from February 24, 2017, to April 4, 2017. He wrote his version of the events in an affidavit on March 18, 2017. He agreed that he had not shared the details of his version of events with anyone other than Defendant and defense counsel prior to completing the affidavit. He also asserted that he did not discuss Defendant's criminal charges with Defendant while they were incarcerated together. Mr. Burns agreed that he was currently incarcerated on the charge of first degree murder and attempted aggravated robbery of a TBI special agent.

Lilly Gill testified that she was Defendant's mother. Approximately a week before the current offenses, Ms. Gill gave Defendant about $600 to help him pay living expenses until he found a job. Amy Cooper testified that Defendant was her boyfriend. Around the time of the offenses, Ms. Cooper gave Defendant approximately $700.

Defendant waived his right to testify and rested his case.

**The State's rebuttal proof**

Sergeant Gilley testified that the passenger who got out of the rental vehicle at the Mall entrance "was definitely 100 percent not Brendan Burns." Sergeant Gilley described the passenger as a "short, black-skinned" man with "shoulder-length microbraids[.]" He testified that he was familiar with Mr. Burns prior to the offenses at issue. Sergeant Gilley identified the lease agreement of the rental vehicle and stated that the name of the lessee was "Olivia Vaulx." He also noted that the jar that contained Defendant's driver's license also contained several other cards of similar shape and material that could also have been used for separating cocaine. On cross-examination, Sergeant Gilley stated that the rental vehicle stopped "right in front of [him]" and that he "looked at the passenger."

Captain Brian Wilson testified that he worked as the assistant jail administrator at the Madison County Jail. He stated that Defendant and Mr. Burns were in the same housing area, A201, from August 11, 2016, through April 4, 2017. He also testified that Defendant and Mr. Burns were housed in the same cell during the following dates: August 11, 2016, through September 1, 2016; September 12, 2016, through September 21, 2016; September 24, 2016, through December 26, 2016; and February 24, 2017, through April 4, 2017.

The jury found Defendant guilty as charged on all counts.

*Sentencing hearing*

The trial court admitted the presentence report and certified copies of Defendant's prior judgments into evidence. In 2004, Defendant entered a best interest plea to two counts of aggravated assault. Defendant also pled guilty to aggravated robbery in 2004. In 2016, Defendant was convicted of driving on a suspended license. The trial court stated that it had considered "the evidence presented at trial and the evidence presented today and arguments of counsel and presentence report, exhibits[,]" "[t]he sentencing guidelines or principles[,]" "the nature and characteristics of the criminal conduct involved, [and] the enhancing and mitigating factors argued by counsel." The trial court noted that the State and Defendant agreed that Defendant was a Range II offender.

The trial court found that Defendant had a previous history of criminal convictions or criminal behavior, in addition to those needed to establish Defendant's sentencing range; the trial court applied this factor to all of Defendant's convictions. The trial court found that Defendant possessed or employed a firearm during the commission of the offense and applied this factor to counts one through four. The trial court also found that Defendant was released on bond during the commission of the offenses because evidence in the presentence report showed that Defendant was on bond on charges from Texas at the time he committed the current offenses. The trial court found that Defendant's criminal conduct neither caused nor threatened serious bodily injury and stated that this factor favored Defendant. The trial court ordered Defendant to serve the following sentences:

| Count | Sentence | Release eligibility percentage | Alignment |
|---|---|---|---|
| One | Eighteen years | Thirty-five percent | |
| Two | Eighteen years | Thirty-five percent | Merged with count one |
| Three | Four years | Thirty-five percent | Consecutive to count one |
| Four | Four years | Thirty-five percent | Merged with count three |
| Five | Eight years | Three years at 100% and five years at thirty-five percent | Consecutive to count three |
| Six | Eight years | Three years at 100% and five years at thirty-five percent | Merged with count five |
| Seven | Eight years | Three years at 100% and five years at thirty-five percent | Merged with count five |
| Eight | Eight years | Three years at 100% and five years at thirty-five percent | Merged with count five |
| Nine | Eight years | Thirty-five percent | Consecutive to count five |
| Ten | Eleven months and twenty-nine days | Seventy-five percent | Concurrent with count one |
| Eleven | Eleven months and twenty-nine days | Seventy-five percent | Concurrent with count one |

The trial court noted that, by statute, counts five through eight were to be served consecutively to counts one through four. Regarding count nine, the trial court determined that Defendant was "a professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood." The trial court based this finding on the current case as well as Defendant's "whole criminal history[.]" The trial court also found that Defendant was "an offender whose record of criminal activity [wa]s extensive" and that Defendant was "a dangerous offender whose behavior indicate[d] little or no regard for human life and no hesitation about committing a crime in which the risk to human life [wa]s high[.]" The trial court found that "[t]he circumstances surrounding the commission of the offense[s] [were] aggravated" and that "the aggregate length of the sentence reasonably relate[d] to the offense[s] of which . . . Defendant [was] convicted." Thus, Defendant received a total effective sentence of thirty-eight years in the Tennessee Department of Correction. Defendant filed a timely motion for new trial,[6] which the trial court denied. Defendant now timely appeals.

_____

[6] Defendant prematurely filed his motion for new trial before the judgments were entered. However, we will address Defendant's issues on the merits because the State did not raise this issue on appeal and we discern no prejudice to the State. *See State v. Siliski*, 238 S.W.3d 338, 374 (Tenn. Crim. App. 2007).

## II. Analysis

### *Motion to suppress*

Defendant asserts that the trial court should have granted the motion to suppress Investigator Cornelison's search of the rental vehicle and seizure of evidence. He argues that Investigator Cornelison had no evidence that he was committing or was about to commit a crime. He also points out that he was arrested at a different location than the rental vehicle, and thus, Investigator Cornelison could not search the rental vehicle as a search incident to Defendant's arrest. The State responds that "[t]he search was properly conducted pursuant to the automobile exception to the warrant requirement" and that "Sergeant Gilley had probable cause to search the car when he smelled the odor of marijuana emanating from the vehicle and when he could see, in plain view, a cup with marijuana in it sitting on the floorboard."

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005).

The United States and Tennessee constitutions protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7; *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 525, 629 (Tenn. 1997).

In *State v. Saine*, the Tennessee Supreme Court set out the following standard for the automobile exception to the Fourth Amendment's warrant requirement:

> The "automobile exception" to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband. The rationale for the automobile exception is two-fold. First, it is often impractical for officers to obtain search warrants in light of the inherent mobility of automobiles. Second, individuals have a reduced expectation of privacy in their automobiles. If the officer has probable cause to believe that the automobile contains

contraband, the officer may either seize the automobile and then obtain a warrant or search the automobile immediately.

297 S.W.3d 199, 207 (Tenn. 2009) (internal citations omitted). The supreme court also held that "the automobile exception does not require a separate finding of exigency under the Tennessee Constitution." *Id.* This court has previously held that "[t]he detection of the odor of marijuana [i]s sufficient to allow the subsequent warrantless search of the automobile[.]" *Hicks v. State*, 534 S.W.2d 872, 874 (Tenn. Crim. App. 1975); *see also State v. Hughes*, 544 S.W.2d 99, 101 (Tenn. 1976).

The Supreme Court of the United State explained in *United States v. Ross*, 456 U.S. 798, 824 (1982), that "[t]he scope of a warrantless search of an automobile" is "defined by the object of the search and the places in which there is probable cause to believe that it may be found." In *State v. David C. Volz*, No. 01C01-9604-CC-00171, 1997 WL 719050, at *5 (Tenn. Crim. App. Nov. 19, 1997), *perm. app. denied* (Tenn. Aug. 3, 1998), this court applied *Ross* and reversed the trial court's suppression of evidence obtained during a warrantless search of the defendant's vehicle. Officers found marijuana in a backpack in the trunk of the defendant's vehicle. *Id.* This court held that officers had probable cause to unzip the backpack in the trunk under the automobile exception based on information from a confidential informant that individuals in the vehicle would be at a particular location for a period of time for the purpose of conducting drug transactions. *Id.*

The plain view doctrine, another exception to the Fourth Amendment's prohibition against warrantless searches, originated in *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971) (plurality opinion), wherein the United States Supreme Court held that "under certain circumstances the police may seize evidence in plain view without a warrant." In Tennessee, the plain view doctrine applies when:

> (1) the officer did not violate constitutional mandates in arriving at the location from which the evidence could plainly be seen; (2) the officer had a lawful right of access to the evidence; and (3) the incriminating character of the evidence was "immediately apparent," *i.e.*, the officer possessed probable cause to believe that the item in plain view was evidence of a crime or contraband.

*State v. Coulter*, 67 S.W.3d 3, 43 (Tenn. Crim. App. 2001) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *Soldal v. Cook County, Illinois*, 506 U.S. 56, 65-66 (1992); *Horton v. California*, 496 U.S. 128, 136-37 (1990); *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987)); *see also State v. Cothran*, 115 S.W.3d 513, 524-25 (Tenn. Crim.

App. 2003) (recognizing that both the United States Supreme Court and Tennessee courts no longer require that seized items be inadvertently discovered).

Here, the trial court found that Sergeant Gilley smelled an odor emanating from the rental vehicle that he believed to be marijuana and observed a substance in the rental vehicle that he believed to be marijuana "based on his education, training, and experience[.]" Thus, the trial court concluded that Sergeant Gilley had probable cause to search the rental vehicle based on his plain view observation and smelling of marijuana. The trial court also relied on the automobile exception for denying the motion to suppress the results of the search of the rental vehicle because it considered Defendant's reduced expectation of privacy in the vehicle, the possibility that Defendant or his passenger could have returned to the vehicle, and the fact that the vehicle was inherently mobile.

We conclude that the trial court did not abuse its discretion by denying Defendant's motion to suppress because the warrantless search of the rental vehicle was supported by both the automobile exception and the plain view exception. Sergeant Gilley recognized the odor of marijuana emanating from the rental vehicle based on his years of experience as a law enforcement officer. The "pungent marijuana odor" gave Sergeant Gilley sufficient probable cause to search the rental vehicle, including the trunk, under the automobile exception because he reasonably believed that the vehicle contained a controlled substance, marijuana. *See David C. Volz*, 1997 WL 719050, at \*5; *see also State v. Tywan Garcia Armstrong*, No. M2008-02837-CCA-R3-CD, 2010 WL 987207, at \*6 (Tenn. Crim. App. Mar. 18, 2010) (concluding that an officer had probable cause to search the entire vehicle for "marijuana, guns, and any evidence of the undercover drug buy" under the automobile exception because the officer smelled marijuana), *no perm. app. filed*.

Additionally, under the plain view exception, Sergeant Gilley did not violate any constitutional mandates by approaching the rental vehicle in the Mall parking lot. When Sergeant Gilley arrived at the vehicle, he shone a light into the vehicle and observed "a clear plastic cup laying in the back floorboard of the vehicle" that contained "broken down marijuana[.]" Lastly, the incriminating nature of the contraband, the appearance of marijuana, was "immediately apparent" to Sergeant Gilley based on his experience as a law enforcement officer who had previously dealt with controlled substances. Thus, Sergeant Gilley had probable cause to search the rental vehicle based on the marijuana in plain view in the vehicle. *See State v. Bryan Herman Dowdy*, No. W2000-01011-CCA-R3-CD, 2001 WL 91732, at \*5 (Tenn. Crim. App. Jan. 26, 2001) (concluding that officers had probable cause to search the defendant's vehicle because they could see beer bottles in plain view in the vehicle), *no perm. app. filed*. Defendant is not entitled to relief on this ground.

*Sufficiency of the evidence*

Defendant argues that the State failed to introduce evidence sufficient to prove the element of possession beyond a reasonable doubt in counts one through nine. He asserts that the jury was confused about the element of possession based on the question that the jury submitted to the trial court during jury deliberation. The State contends that the evidence was sufficient to support Defendant's convictions on all charges.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

**Possession of cocaine and marijuana with the intent to sell or deliver**

It is a criminal offense for a person to knowingly "[p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4) (2016). Cocaine is a Schedule II controlled substance. Tenn. Code Ann. § 39-17-408(b)(4) (2016). Possession of cocaine weighing 0.5 grams or more with the intent to sell or deliver the substance is a Class B felony. Tenn. Code Ann. § 39-17-417(c)(1) (2016). Marijuana is a Schedule VI controlled substance. Tenn. Code Ann. § 39-17-415(a)(1) (2016). Possession of one-half ounce to ten pounds of marijuana with the intent to sell or deliver is a Class E felony. Tenn. Code Ann. § 39-17-417(g)(1) (2016).

Possession "may be either actual or constructive." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). When a person "knowingly has direct physical control over a thing, at

- 15 -

a given time, [that person] is then in actual possession of it." *State v. Edmondson*, 231 S.W.3d 925, 928 (Tenn. 2007) (quoting BLACK'S LAW DICTIONARY 1163 (6th ed. 1990)). When a person knowingly has "the power and the intention at a given time to exercise dominion and control over an object, either directly or through others[,]" that person has constructive possession over the object. *United States v. Craig*, 522 F.2d 29, 32 (6th Cir. 1975) (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)); *see also State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."

Tenn. Code Ann. § 39-11-302(b) (2016). "Proof that a possession is knowing will usually depend on inference and circumstantial evidence." *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995). "The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987).

With regard to a determination of intent to sell or deliver, proof of intent usually consists of circumstantial evidence and the inferences that can be reasonably drawn from that evidence. *See Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983) (observing that a jury may derive a defendant's intent from both direct and circumstantial evidence). The jury may infer "from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Tenn. Code Ann. § 39-17-419 (2016).

Initially, we will address Defendant's contention that the jury was confused about the element of possession because the jury asked the trial court a question during deliberation. The jury's question said, "If more than one person is in a vehicle and drugs are found, is the driver automatically the owner?" Both the State and defense counsel agreed that the trial court properly instructed the jury on possession, so the trial court instructed the jury to review the instructions on possession. On appeal, we must presume that the jury followed the trial court's instructions. *See State v. Lawson*, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985). Any attempt to divine the meaning behind the jury's deliberations is not appropriate for our review of the sufficiency of the evidence. *See State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015) (quoting *United States v. Zane*, 495 F.2d

683, 690 (2nd Cir. 1974)) (recognizing "the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning").

Special Agent Hall testified that the marijuana in one bag recovered from the rental vehicle weighed 17.06 grams and that the gross weight of the second bag of marijuana was 15.57 grams. Additionally, he testified that the gross weight of the cocaine was 3.42 grams. Sergeant Gilley estimated that the marijuana found in the rental vehicle was worth between $500 and $600 and that the cocaine was worth between $1,000 and $3,000. Sergeant Gilley stated that drug dealers frequently carried weapons to discourage individuals from stealing proceeds of drug sales or the controlled substance. Sergeant Gilley testified that, in his opinion, the amount of cocaine that was recovered from the rental vehicle was not consistent with personal use because cocaine users do not carry cocaine around. Instead, cocaine users generally purchase smaller amounts and use the drug rather than carry the drug with them. Sergeant Gilley testified that, similarly, the amount of marijuana recovered in the rental vehicle was not consistent with personal use because "most marijuana users that [law enforcement] run[s] into are not going to run around with over a half ounce of marijuana on them because they know a half ounce or more of marijuana is a felony."

Officers also recovered a firearm, three sets of scales, and plastic baggies from the rental vehicle. Further, Defendant informed Ms. Hays that another inmate stole $1,100 from him at the Madison County Jail, and Mr. Campbell later found $1,070 in a toilet pipe in the jail. Sergeant Gilley testified that individuals frequently use plastic bags and digital scales to measure out and package controlled substances for illegal sale and distribution. Sergeant Gilley also stated that the fact that Defendant had over $1,000 in his possession in the Madison County Jail indicated that Defendant had recently sold some drugs. When the evidence is viewed in the light most favorable to the State, we conclude that the State presented sufficient evidence for a rational juror to find Defendant guilty of possessing cocaine and marijuana with the intent to sell or distribute the controlled substances beyond a reasonable doubt. Defendant is not entitled to relief on this ground.

**Unlawful possession of a firearm**

Defendant was also convicted of four counts of unlawful possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony and one count of unlawful possession of a firearm after being convicted of a felony involving the attempted use of force, violence, or a deadly weapon.

"It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." Tenn. Code Ann. § 39-17-

1324(a) (2016). Dangerous felonies include "a felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance." Tenn. Code Ann. § 39-17-1324(i)(1)(L) (2016). "A person commits an offense who unlawfully possesses a firearm, as defined in [section] 39-11-106, and[] . . . [h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon[.]" Tenn. Code Ann. § 39-17-1307(b)(1)(A) (2016). "Crime of violence" includes aggravated robbery. Tenn. Code Ann. § 39-17-1301(3) (2016).

We conclude that there was sufficient evidence for a rational juror to find Defendant guilty of possessing a firearm during the commission of a dangerous felony, *i.e.*, the possession of more than one-half gram of cocaine and one-half ounce to ten pounds of marijuana with the intent to sell or deliver, in counts five through eight. We have previously concluded that the evidence was sufficient to support Defendant's convictions for possession of marijuana and cocaine with the intent to sell or deliver. Sergeant Gilley observed Defendant exit the driver's seat of the rental vehicle in the Mall parking lot. Later, Sergeant Gilley found a Glock handgun with a laser sight under the driver's seat when he searched the rental vehicle. Additionally, Mr. Simpson testified that Defendant purchased a laser sight at Gander Mountain in March. Mr. Simpson recalled that he assisted Defendant by installing the laser sight onto a Glock handgun. When viewed in the light most favorable for the state, this evidence is sufficient for a rational juror to have found that Defendant possessed the Glock handgun that was found in the rental vehicle.

Further, it was within the province of the jury to infer that Defendant possessed the Glock firearm with the intent to go armed while he was selling or delivering controlled substances. As we have set out above, the jury could have inferred that Defendant was selling or had recently sold drugs based on the quantity of the cocaine and marijuana found in the vehicle, the drug paraphernalia such as baggies and scales that officers recovered from the vehicle, as well as Defendant's report that another inmate stole over $1,000 in cash from him while in the Madison County Jail. Additionally, Sergeant Gilley testified that drug dealers frequently carry firearms when they engage in the sale or delivery of controlled substances to protect themselves.

The evidence was also sufficient for a rational juror to find Defendant guilty of possessing the Glock firearm while having been previously convicted of aggravated robbery. Prior to trial, Defendant and the State stipulated that Defendant was convicted of aggravated robbery in 2004. As we have previously stated, it was the jury's prerogative to infer that Defendant, as the driver of the vehicle, possessed the Glock firearm that was found under the driver's seat. Defendant is not entitled to relief on this ground.

- 18 -

## Possession of drug paraphernalia

To convict Defendant of possession of drug paraphernalia, the State must have established the following essential elements: "(1) that the defendant possessed an object; (2) that the object possessed was classifiable as drug paraphernalia; and (3) that the defendant intended to use that object for at least one of the illicit purposes enumerated in the statute." *State v. Ross*, 49 S.W.3d 833, 846 (Tenn. 2001) (citing Tenn. Code Ann. § 39-17-425(a)(1)). The "illicit purposes" outlined in section 39-17-425(a)(1) include the following, in pertinent part: to "process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance[.]" Tenn. Code Ann. § 39-17-425(a)(1) (2016). In *Ross*, the supreme court determined that the evidence was sufficient for a rational juror to have found that the defendant used "electronic scales and plastic sandwich bags" as drug paraphernalia. *Ross*, 49 S.W.3d 846.

Similarly, we conclude that the evidence was sufficient for a rational juror to have found Defendant guilty of possession of drug paraphernalia beyond a reasonable doubt based on his possession of three sets of scales and plastic baggies in the rental vehicle. Sergeant Gilley testified that individuals frequently use plastic bags and digital scales to measure out and package controlled substances for illegal sale and distribution. We have previously concluded that the evidence was sufficient for a rational juror to have found Defendant guilty beyond a reasonable doubt of possession of marijuana and cocaine with the intent to sell or deliver. Based on the evidence and Sergeant Gilley's testimony, it was within the province of the jury to infer that Defendant possessed the scales and baggies for the purpose of measuring and bagging the controlled substances for the purposes of selling or delivering the substances. Further, it was the jury's prerogative as the factfinder to discredit Mr. Burns' testimony and to find that Defendant possessed the scales and baggies. We will not overturn the jury's factual findings on appeal. *Bland*, 958 S.W.2d 659. Defendant is not entitled to relief on this ground.

## Evading arrest

"[I]t is unlawful for any person to intentionally conceal themselves or flee by any means of locomotion from anyone the person knows to be a law enforcement officer if the person[] . . . [k]nows the officer is attempting to arrest the person[.]" Tenn. Code Ann. § 39-16-603(a)(1)(A) (2016). Investigator Cornelison testified that he and the other officers were looking for Defendant to execute an arrest warrant from Texas. The officers located Defendant at the Mall. As Defendant walked into the Mall, Investigator Cornelison "walked in behind him attempting to catch up to him[.]" Defendant turned around, observed that Investigator Cornelison was following him, and "he took off running." Investigator Cornelison yelled, "Stop. Stop. Police." Additionally,

Investigators Cornelison and Foster wore vests marked "police" when they attempted to arrest Defendant on the active Texas warrants. This evidence is sufficient for a rational juror to have found Defendant guilty of evading arrest beyond a reasonable doubt. Defendant is not entitled to relief on this ground.

### *The State's impeachment of Mr. Burns*

Defendant also argues that the trial court erred in allowing the State to impeach Mr. Burns's credibility under Tennessee Rule of Evidence 608(b) by questioning him on cross-examination about Mr. Burns's pending criminal charges. He states that "[t]he actions of the State in informing the jury of [Defendant]'s incarceration, questioning Mr. Burns about murdering a TB1 agent during a drug transaction, and invoking prejudice with the jury by mentioning the fact that the TBI agent had children eliminated any chance [Defendant] had to receive a fair trial." The State responds that "[t]he trial court properly allowed the State to impeach Mr. Burns's testimony by asking him about his pending first-degree murder charge" and that, "[a]lternatively, any error that resulted from the State's questioning was harmless."

During the State's cross-examination of Mr. Burns, the State asked Mr. Burns if he sold drugs and if he was good friends with Defendant. Mr. Burns responded affirmatively to both questions. Mr. Burns also agreed that he had been previously incarcerated with Defendant. Defense counsel objected when the State asked Mr. Burns if he was incarcerated pending his trial for the first degree murder of a TBI agent. During a jury-out hearing, the State argued that it could impeach Mr. Burns's credibility because the allegations of attempted aggravated robbery and first degree murder were specific acts of conduct that were probative of Mr. Burns's character for untruthfulness under Tennessee Rule of Evidence 608(b). Defense counsel argued that the State could not impeach Mr. Burns on pending charges. The State informed the trial court of its theory that Mr. Burns testified that he owned the contraband in the rental vehicle because Mr. Burns "face[d] little to no repercussions because of the nature of the charges he face[d]." The trial court examined Rule 608 and noted that the objection related to the testimony of a fact witness, not Defendant or a character witness. The trial court found that the State had established a reasonable factual basis for the inquiry into Mr. Burns's alleged specific acts of conduct.[7] The trial court also held that the State could cross-examine Mr. Burns on "the ability of . . . Defendant and [Mr. Burns] to communicate on a regular basis regarding the issue of [Mr. Burns]'s testimony."

---

[7] The State's evidence of Mr. Burns's alleged criminal acts was based on a video recording from the TBI agent's dash camera. The recording depicts Mr. Burns's alleged attempted aggravated robbery and murder of the TBI agent during a controlled drug buy.

After the trial court viewed the State's video evidence of Mr. Burns's alleged attempted aggravated robbery and first degree murder, the trial court stated the following:

The [c]ourt having again reviewed 608(b) and the criteria that must be considered by the [c]ourt for purposes of allowing impeachment and questioning regarding the prior bad acts, the [c]ourt finds that the cross-examination will be proper under the circumstances that the alleged acts that have been brought before the [c]ourt dealing with the attempted aggravated robbery resulting in the death of an individual in this case certainly have probative value of untruthfulness. They deal with dishonesty and deceit when it comes to the attempted aggravated robbery. The shooting was just a result of that as part of the factual circumstances that occurred just in the chain of events. So I'll allow cross-examination.

During a later exchange in the State's cross-examination of Mr. Burns, the State asked Mr. Burns why he was currently incarcerated. Mr. Burns responded "[f]or first degree murder[,]" and the State asked, "And that's the first degree murder of a TBI special agent, isn't it?" Mr. Burns agreed. The State then asked Mr. Burns if the murder occurred while he attempted to sell drugs to the TBI agent. Defense counsel objected on the ground that the State had previously asked Mr. Burns about his current incarceration, and Mr. Burns had answered the question. The trial court ruled that the State could "ask, and then move on." Mr. Burns agreed that he attempted to sell drugs to the TBI agent and then pulled his gun and attempted to rob the agent. The agent pulled out his gun and Mr. Burns shot him.

Tennessee Rule of Evidence 608(b) provides the following:

(b) Specific Instances of Conduct. Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has

probative value and that a reasonable factual basis exists for the inquiry;

(2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under this paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect[.]

Tenn. R. Evid. 608(b)(1)-(2).

During a jury-out hearing, the trial court found that the evidence of Mr. Burns's alleged attempted aggravated robbery and first degree murder charges was probative of Mr. Burns's character for truthfulness or untruthfulness. The trial court found that there was a factual basis for the State's impeachment of Mr. Burns's character for truthfulness based on the video recording of the controlled buy that led to Mr. Burns's alleged attempted aggravated robbery and first degree murder of an undercover TBI agent. Mr. Burns's alleged criminal conduct occurred on August 9, 2016, which was less than ten years prior to the commencement of prosecution against Defendant on the current offenses. The trial court properly focused on the probative value of Mr. Burns's alleged criminal conduct and how "the attempted aggravated robbery result[ed] in the death of an individual"; the trial court noted that the attempted aggravated robbery involved "dishonesty and deceit" and "[t]he shooting was just a result of that as part of the factual circumstances that occurred just in the chain of events." We also note that the trial court was not required by the Tennessee Rules of Evidence to weigh the probative value of the specific acts of conduct at issue with the prejudice to Defendant because the acts occurred less than ten years prior to Defendant's charges in this case. *See* Tenn. R. Evid. 608(b)(2).

We must also address Defendant's argument that he was denied a fair trial because the State implied that Defendant had previously been incarcerated on the current charges by asking Mr. Burns if he had been housed in the same cell as Defendant. When Defendant objected during the State's cross-examination of Mr. Burns, the trial court ruled that the State could ask Mr. Burns whether he had been housed with Defendant so that the State could pursue its theory that Mr. Burns had access to Defendant's discovery materials and Defendant and Mr. Burns created Mr. Burns's testimony and affidavit while they were housed together. We note that, after the trial court's ruling, Defendant

- 22 -

did not object when the State asked Mr. Burns whether he was housed with Defendant or when the State called Captain Wilson as a rebuttal witness to set out the exact dates that Defendant and Mr. Burns were housed together at the Madison County Jail. To the extent that Defendant is attempting to raise a separate claim that he was denied a fair trial, we conclude that this claim is waived for failure to cite to any authority. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). In any event, this court has previously noted that the improper admission of evidence that is cumulative to evidence already admitted is harmless error. *See State v. Elisa Cochran*, No. 03C01-9708-CR-00353, 1998 WL 783343, at \*7 (Tenn. Crim. App. Nov. 3, 1998), *perm. app. denied* (Tenn. May 10, 1999). Thus, we conclude that the trial court properly allowed the State to cross-examine Mr. Burns about the alleged attempted aggravated robbery and first degree felony murder.

### *Excessive sentence*

Lastly, Defendant argues that the trial court erred in ordering him to serve an excessive sentence. He asserts that he should have received the minimum sentence for each count and that the trial court should have ordered him to serve his sentences concurrently. The State responds that the trial court properly exercised its discretion by ordering Defendant to serve sentences above the statutory minimum and by ordering partially consecutive sentence alignment.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf

about sentencing.  *See* Tenn. Code Ann. § 40-35-210(b)(1)-(7) (2017); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen.  Tenn. Code Ann. § 40-35-210(e) (2017); *Bise*, 380 S.W.3d at 706.  However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]."  *Bise*, 380 S.W.3d at 705-06.  The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper.  Tenn. Code Ann. § 40-35-401 (2017), Sentencing Comm'n Cmts.

**Sentence Length**

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2017).  The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed.  Tenn. Code Ann. § 40-35-103(5) (2017).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only.  *See* Tenn. Code Ann. § 40-35-114 (2017); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).  We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion."  *Carter*, 254 S.W.3d at 345.  In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'"  *Id.* at 343.  A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005."  *Bise*, 380 S.W.3d at 706.  "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a

manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

Although our supreme court has not specifically held whether the *Bise* standard of review applies to misdemeanor sentencing, it has held that "[t]he abuse of discretion standard, accompanied by a presumption of reasonableness, is the appropriate standard of appellate review for all sentencing decisions." *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013). Accordingly, we conclude that the *Bise* standard is the appropriate standard of review in misdemeanor sentencing cases. *See State v. Clifford Eric Marsh*, No. M2015-00803-CCA-R3-CD, 2016 WL 349928, at *3 (Tenn. Crim. App. Jan. 28, 2016), *no perm. app. filed*; *see also State v. Sue Ann Christopher*, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *7 (Tenn. Crim. App. Mar. 14, 2013), *perm. app. denied* (Tenn. June 18, 2013).

When sentencing a defendant for a misdemeanor conviction, the trial court may conduct a separate sentencing hearing or "allow the parties a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." Tenn. Code Ann. § 40-35-302(a) (2017). The trial court must impose a sentence consistent with the purposes and principles of our sentencing act. Tenn. Code Ann. § 40-35-302(b) (2017). "In imposing a misdemeanor sentence, the [trial] court shall fix a percentage of the sentence that the defendant shall serve." Tenn. Code Ann. § 40-35-302(d) (2017). "In determining the percentage of the sentence to be served in actual confinement, the [trial] court shall consider the purposes of this chapter, the principles of sentencing and the enhancement and mitigating factors set forth in this chapter and shall not impose such percentages arbitrarily." Tenn. Code Ann. § 40-35-302(d) (2017). A defendant convicted of a misdemeanor is not entitled to a presumption of a minimum sentence. *State v. Creasy*, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). The trial court is not required to place its specific findings in ordering a misdemeanor sentence on the record. *State v. Troutman*, 979 S.W.2d 271, 273 (Tenn. 1998). "Misdemeanor sentencing is designed to provide the trial court with continuing jurisdiction and a great deal of flexibility." *State v. Combs*, 945 S.W. 2d 770, 774 (Tenn. Crim. App. 1996).

Here, the trial court ordered in-range sentences for each of Defendant's felony convictions. Possession of one-half gram or more of cocaine with the intent to sell or deliver is a Class B felony. Tenn. Code Ann. § 39-17-417(c)(1) (2016). A Range II sentence for a Class B felony is twelve to twenty years, and Defendant received a sentence of eighteen years each in counts one and two. Tenn. Code Ann. § 40-35-112(b)(2) (2017). Possession of one-half ounce to ten pounds of marijuana with the intent to sell or deliver is a Class E felony. Tenn. Code Ann. § 39-17-417(g)(1) (2016). A Range II sentence for a Class E felony is two to four years, and Defendant received a

sentence of four years each in counts three and four. Tenn. Code Ann. § 40-35-112(b)(5) (2017).

Unlawful possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony is a Class D felony, and the trial court is required by statute to impose a minimum sentence of five years. Tenn. Code Ann. § 39-17-1324(g)(2) (2016). A Range II sentence for a Class D felony is four to eight years, and Defendant received a sentence of eight years each in counts five through eight. Tenn. Code Ann. § 40-35-112(b)(4) (2017). Unlawful possession of a firearm after being convicted of a felony involving the attempted use of force, violence, or a deadly weapon is a Class C felony. Tenn. Code Ann. § 39-17-1307(b)(2) (2016). A Range II sentence for a Class C felony is six to ten years, and Defendant received a sentence of eight years in count nine. Tenn. Code Ann. § 40-35-112(b)(4) (2017). Because the trial court ordered Defendant to serve within-range felony sentences, we apply a presumption of reasonableness to the trial court's sentencing decisions, and we will not reverse absent an abuse of discretion.

Evading arrest is a Class A misdemeanor. Tenn. Code Ann. § 39-16-603(a)(1)(A) (2016). Possession of drug paraphernalia is also a Class A misdemeanor. Tenn. Code Ann. § 39-17-425(a)(2) (2016). Defendant received a sentence of eleven months and twenty-nine days for each of his sentences in counts ten and eleven. We will also presume that these misdemeanor sentences are reasonable and will not reverse the trial court's decision absent an abuse of discretion.

The trial court considered the factors required by section 40-35-210 and found that several enhancement factors applied to Defendant's convictions: (1) that Defendant previous history of criminal convictions or criminal behavior, in addition to those needed to establish Defendant's sentencing range; (2) that Defendant possessed or employed a firearm during the commission of the offense, which the trial court applied to counts one through four; and (3) that Defendant was released on bond from his Texas charges during the commission of the current offenses. *See* Tenn. Code Ann. § 40-35-114(1), (9), (13)(A) (2017). The trial court also applied one mitigating factor—that Defendant's criminal conduct neither caused nor threatened serious bodily injury. *See* Tenn. Code Ann. § 40-35-113(1) (2017).

Although Defendant argues that he should have received the minimum sentence within each range, he does not present any specific argument that the trial court erred in apply one or more of the enhancement factors. Regardless, we conclude that the evidence presented at the sentencing hearing supports the trial court's enhancement of Defendant's sentences based on section 40-35-114(1) and (9). However, the trial court improperly relied on section 40-35-114(13)(A) because the State did not introduce

- 26 -

evidence that Defendant was "ultimately convicted of the prior misdemeanor or felony[,]" third degree felony assault strangulation or suffocation in Texas, as required by the Sentencing Act. *See* Tenn. Code Ann. § 40-35-114(13)(A) (2017) ("At the time the felony was committed, . . . [the defendant was] [r]eleased on bail or pretrial release, if the defendant is ultimately convicted of the prior misdemeanor or felony[.]"). In any event, the trial court's reliance on enhancement or mitigating factors are advisory only, and the trial court properly found that other enhancement factors applied to Defendant's convictions. The trial court did not abuse its discretion by enhancing Defendant's sentences within the appropriate statutory range. *See Bise*, 380 S.W.3d at 706.

**Consecutive sentence alignment**

In *Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. *Pollard*, 432 S.W.3d at 859. Tennessee Code Annotated section 40-35-115 sets forth different criteria for the imposition of consecutive sentencing, including the following:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]

Tenn. Code Ann. § 40-35-115(b)(1), (2), (4) (2017). Any one ground set out in the above statute is "a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* (citing Tenn. R. Crim. P. 32(c)(1)).

Section 40-35-115(b)(2) has been interpreted "to apply to offenders who have an extensive history of criminal convictions and activities, not just to a consideration of the offenses before the sentencing court." *State v. Palmer*, 10 S.W.3d 638, 647-49 (Tenn. Crim. App. 1999). Additionally, "an extensive record of criminal activity may include

- 27 -

criminal behavior which does not result in a conviction." *State v. Koffman*, 207 S.W.3d 309, 324 (Tenn. Crim. App. 2006).

Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). In order to limit the use of the "dangerous offender" category to cases where it is warranted, our supreme court has stated that the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

Here, the trial court properly noted that, by statute, counts five through eight were to be served consecutively to counts one through four. *See* Tenn. Code Ann. § 39-17-1324(e)(1) (2017). Regarding count nine, the trial court determined that Defendant was "a professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood[,]" and ordered Defendant to serve count nine consecutively to count five. The trial court based this finding on the current case as well as Defendant's "whole criminal history[.]" The trial court also found that Defendant was "an offender whose record of criminal activity [wa]s extensive" and that Defendant was "a dangerous offender whose behavior indicate[d] little or no regard for human life and no hesitation about committing a crime in which the risk to human life [wa]s high[.]" The trial court found that "[t]he circumstances surrounding the commission of the offense[s] [were] aggravated" and that "the aggregate length of the sentence reasonably relate[d] to the offense[s] of which . . . Defendant [was] convicted."

We conclude that the trial court did not abuse its discretion by ordering Defendant to serve his sentence for count nine consecutively to his sentence for count five. The record supports the trial court's finding that Defendant was a professional criminal. Defendant's current offenses include possession of cocaine and marijuana with the intent to sell or deliver, and Sergeant Gilley estimated that the marijuana found in the rental vehicle was worth $500 to $600 and that the cocaine was worth $1,000 to $3,000. Additionally, Defendant reported to Ms. Hays that another inmate stole over $1,000 from him, which the jury could have inferred were profits from recent drug sales. Additionally, the presentence report reflected that Defendant had no verified employment. Regarding Defendant's extensive history of criminal behavior, Defendant was wanted in Texas on a charge of third degree felony assault strangulation or suffocation when he committed the eleven offenses at issue in this case. Additionally, Defendant was previously convicted of aggravated assault, aggravated robbery, and driving on a suspended license. Regarding the trial court's application of the "dangerous

offender" factor, the trial court made the findings required by *Wilkerson,* and the record supports the trial court's imposition of that factor. The trial court did not abuse its discretion by ordering Defendant to serve his sentence in count nine consecutively to his sentence in count five.

## III. Conclusion

After a thorough review of the facts and applicable case law, we affirm the trial court's judgments.

_____
ROBERT L. HOLLOWAY, JR., JUDGE